Filed 8/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>LYNDA GABRIELLA OGG,<br><br>　　Defendant and Appellant. | 2d Crim. No. B238733<br>(Super. Ct. No. 2009018366)<br>(Ventura County) |

A parent has an exceptional and unique relationship with his or her children; this principle needs no citation.

A mother knows her child is continuously sexually molested by mother's boyfriend. She can act to protect her child from this crime, but chooses not to do so. We conclude that the mother's failure to protect her child from continuous sexual abuse supports her conviction as an aider and abettor of the crime.

Lynda Gabriella Ogg appeals from a judgment after conviction of aiding and abetting the continuous sexual abuse of her daughter A. R. by Daniel Ogg. (Pen. Code, §§ 31, 288.5.)[1] The trial court sentenced Ogg to the upper term of 16 years in prison. It imposed fines and fees, including a $70 acquired immune deficiency syndrome (AIDS) education fee. (§ 1463.23.) We modify the judgment to strike an AIDS education fee, but otherwise affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated. We refer to Daniel Ogg as "Daniel," to ease the reader's task.

*FACTUAL AND PROCEDURAL BACKGROUND*

In 1993, A. R. was born. When she was about 6 years old, Ogg began dating Daniel and he moved into her home. During the following 10 years, Daniel sexually abused A. R. Ogg was not present during the abuse. At trial, A. R. testified that Daniel performed oral sex on her more than three times when she was between the ages of 6 and 10, more than three times when she was between the ages of 10 and 12, and more than three times when she was between the ages of 12 and 14.

A. R. testified that the abuse began as a "food game" when she was 6 years old. Daniel told A. R. to close her eyes and he put food in her mouth, asking her to guess what it was. Then he placed his penis in her mouth and told her that it was a hot dog. Later, he placed his penis in her mouth without the "food game" pretense. A. R. believed this happened about seven times.

When A. R. was 6 years old, she informed her mother that Daniel had placed his penis in her mouth. In a later police interview, Ogg denied that this conversation occurred. Thereafter, Daniel's sexual abuse of A. R. ceased for approximately a year. A. R. testified that when she was about 8 years old, he forced her to orally copulate him once a month. When she was 10 years old, Daniel performed oral sex on her. A. R. did not remember the frequency of the abuse.

Daniel's biological daughter P., who was 4 years younger than A.R., also lived in the Ogg home. Ogg worked outside the home, but Daniel did not.

When A. R. was 10 years old, she again informed her mother that Daniel placed his penis in her mouth. Ogg asked "if [she] liked it." A. R. replied, "No." Ogg responded that A. R. could either call the police or give Daniel another chance. Ogg said to A.R. that if A. R. "gave him another chance, [A. R.] couldn't tell anyone because they would go to jail and [A. R. would] go to foster care." A. R. decided to give Daniel another chance. She "was scared to go to the police." A. R. feared that if she told the police about her abuse, her little brother would be placed in foster care. Ogg told her that foster care "was really bad and [Ogg] used to get raped and molested in foster care."

2

In 2004, Ogg married Daniel; A. R. was then 11 years old. Daniel continued to orally copulate A. R. When she was 12, he began kissing her on her mouth and digitally penetrating her. Before she was 14, he tried to have sexual intercourse with her but she "squirmed away" and complained of pain. When she was 14, he had sexual intercourse with her every two weeks. When she was 15, he stopped for five months, but then began again. The abuse stopped at age 16 when A. R. told a friend who reported it.

Police officers arrested Daniel. When interviewed by the police, Ogg denied knowing "anything" regarding the sexual abuse. Eventually, she admitted to an investigator that Daniel had mentioned it when A. R. was 10 years old. Ogg stated that Daniel awoke from sleep and said that "he had been having impure thoughts, and that he had had [A. R.] take off her clothes, sit next to him and . . . touch his penis." Daniel added that he "would have [A. R.] get undressed and sit next to him, and he would put her hand on his penis and she'd take it off and he'd put it back, and then he'd take it off and then that was it." Ogg stated that she was upset and did not go to work the following day. Instead, she took A. R. to breakfast and spent the day with her discussing Daniel's acts. A. R. "confirmed" the abuse. Ogg did not express disbelief about the abuse to the investigator.

Ogg said she did not know how many times it happened. She said, "[I]t probably -- [¶] -- happened a few times but I don't know. . . . Nobody gave me a number." The investigator asked, "But you inferred from -- [¶] -- the one time that it happened several times?" Ogg answered, "It kind of seemed like it . . . ." Ogg said she asked Daniel "if anything else happened" and he said "No." Ogg claimed no knowledge of sexual touching, oral sex, or sexual intercourse between Daniel and A. R.

Ogg admitted that she had no "good reason" for not calling the police. She "asked [A. R.] . . . what she wanted [Ogg] to do" and "[A. R.] . . . didn't know." Ogg "didn't know what to do either." Ogg thought Daniel's behavior was inappropriate, but he "said he wouldn't do it again and [she] believed him . . . ." She "kept checking with [A. R.]" whether anything else happened and A. R. said "No." Ogg did not question Daniel again. She expressed fear that she would lose her children.

3

For several months afterward, Ogg did not leave A. R. alone with Daniel. She occasionally asked A. R., "Has anything happened?" and A. R. would respond, "No." Ogg "figured everything's okay" because when the family watched television A. R. would "lay down behind [Daniel] and play with his hair."

Jan Schulman, Ogg's mother, testified that after Daniel's arrest, she asked Ogg why she did not protect A. R. Ogg replied that "the kids would come and go, but Daniel would be in her life forever."

Schulman testified that she suspected that someone had sexually abused A. R. because of her behavior. Schulman relayed her concerns to Ogg, who "shrugged it off." Schulman called Child Protective Services (CPS), but CPS required a formal complaint from Ogg or a statement from A. R. complaining of sexual abuse.

Schulman stated that she and Ogg, both school district employees, were "mandated reporters." At times at the workplace, they discussed their reporting duties.

In 2003, CPS investigated an allegation that Daniel had molested P., but concluded that the allegation was unfounded. The trial court overruled a hearsay objection to evidence of the allegation which involved a "food game." The court admitted the evidence to corroborate A. R.'s testimony concerning a similar game Daniel played with her. P.'s mother, Patricia Doles, testified that in 2001, Daniel stated that he asked P. to close her eyes while he put a pickle in her mouth. P. thought it was a penis. The court admonished the jury that the statement was not to be considered for the truth of the matter asserted.

Doles also testified that Ogg informed her that Daniel admitted he had done something "inappropriate" with A. R. Doles advised Ogg to report it, but Ogg declined because she feared losing custody of her children. Subsequently, they discussed it and Ogg said it "hadn't happened again, but if it did, [A. R.] would tell her." In a police interview, Ogg denied having this conversation with Doles.

In 2003, Doles gave Daniel custody of P. when she joined the army. Doles said she "felt confident that he was not doing anything to [P.] sexually." Doles said later

4

in 2003, CPS investigated an allegation that Daniel molested P. Doles related the "pickle story" to CPS, which then determined the allegations were unfounded.

Doles left the army, and a court later awarded joint physical custody of P. to Doles and Daniel. Ogg was present at the custody proceedings. Ogg informed police officers that she knew CPS had investigated the allegation regarding Daniel and P. and concluded the allegation was unfounded.

*DISCUSSION*

*Specific Intent to Aid or Abet Sexual Abuse*

Ogg concedes that she failed to protect A. R., but contends that the evidence is insufficient to establish that she acted with the intent or purpose of committing, encouraging, or facilitating commission of the crime of continuous sexual abuse of a child to support her conviction as an aider and abettor. (*People v. Houston* (2012) 54 Cal.4th 1186, 1224 [general statement of aiding and abetting].)

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not reweigh the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Streeter,* at p. 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar,* at p. 60.)

All persons involved in the commission of a crime, whether acting directly or aiding and abetting, are principals in the crime committed. (§ 31; *People v. Delgado* (2013) 56 Cal.4th 480, 486.) A principal commits continuous sexual abuse of a child under the age of 14 years if the person has recurring access to the child over a period of at

5

least three months and "engages in three or more acts of substantial sexual conduct" or "three or more acts of lewd or lascivious conduct" with the child. (§ 288.5.) Lewd and lascivious conduct requires proof of specific intent to arouse, appeal to, or gratify the sexual desires of either party. (§ 288, subd. (a); *People v. Scott* (1994) 9 Cal.4th 331, 343.) Substantial sexual conduct does not require proof of specific intent. It requires proof only of "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 1203.066, subd. (b); *People v. Whitman* (1995) 38 Cal.App.4th 1282, 1294.)

An aider and abettor must "share the specific intent of the perpetrator." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) He or she shares the specific intent of the perpetrator if he or she "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid*.) It is not necessary that the aider and abettor be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor seek to share the fruits of the crime. *(Ibid.)*

Generally, failure to prevent a crime is insufficient to establish aiding and abetting liability. But "[a]iding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack." (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1219 [upholding mother's conviction for murder as aider and abettor based on failure to protect against deadly physical abuse of child in her presence after court order forbade contact with the abuser].) "[A] parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack." (*Ibid.*) Thus, in *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744, the court found sufficient evidence to hold a mother to answer for two counts of committing lewd and lascivious acts upon her child, as an aider and abettor, because she watched and did nothing to intervene while her boyfriend twice performed oral sex on the child in their bed.

6

Sufficient evidence and reasonable inferences therefrom establish that Ogg knew the full extent of Daniel's criminal purpose and, by her inaction, intended to facilitate his sexual abuse. It is a reasonable inference that Ogg, the mother and caretaker of her minor daughter, knew Daniel had molested A. R. and would continue to molest her without intervention. A. R. told Ogg twice that Daniel was molesting her and Ogg believed her. Daniel also admitted to Ogg that he molested A. R. Ogg facilitated the continuing sexual abuse when she kept Daniel in the home, married him, and discouraged A. R. from reporting the abuse. She warned A. R. that if A. R. reported the abuse to the police, she would be placed in foster care and implied that she could be raped, and that Ogg would be incarcerated. This is substantial evidence to support the reasonable inference that Ogg's warnings were motivated by her selfish desire to continue her relationship with Daniel, and that she had no concern for A. R.'s protection. Ogg said as much when she explained to her mother that children "come and go, but Daniel and I are forever." Ogg also expressed no concern for A.R.'s welfare in her police interview.

It matters not that Ogg did not intend to gratify her own sexual desires. Her conviction requires proof that she failed to protect her daughter when she knew of Daniel's criminal purpose. She both acted and failed to act with the intent to facilitate his abuse. Substantial evidence supports the inference that Ogg chose to facilitate the abuse rather than sever her relationship with Daniel. Moreover, Ogg concealed the abuse by dissuading A. R. from reporting it. "The culpability of a person . . . who, in essence, condones such abusive behavior and then attempts to hide it, thereby compounding the psychological harm to the child, must be as great as that of the perpetrator." (*People v. Manners* (1986) 180 Cal.App.3d 826, 833 [grandmother convicted as aider and abettor when she twice witnessed sexual abuse and advised grandson not to report it].)

We reject the argument that Ogg cannot be guilty of aiding and abetting because she was not present when Daniel committed his crimes against A. R. That, up to now, there have been no reported California decisions directly on point does not persuade us otherwise. "Although the law does not generally require an individual to come to the aid of another, certain relationships exist which require such action. Criminal conduct

7

may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." (*People v. Stanciel* (1992) 153 Ill.2d 218, 236.) It goes without saying that a parent has such a duty.

*Knowledge of Three or More Incidents of Abuse and Proper Jury Instructions.*

Continuous sexual abuse requires proof of at least three acts of substantial sexual contact or lewd and lascivious conduct over a period of at least three months. (§ 288.5.) Ogg contends she cannot aid and abet this crime because there is no evidence she knew of more than two acts of sexual molestation. Sufficient evidence and reasonable inferences therefrom support the finding that Ogg knew Daniel intended to engage in three or more acts of sexual abuse of A. R. over the course of more than three months. Ogg allowed Daniel years of recurring access to A. R. after Ogg first learned that he had placed his penis in A. R.'s mouth, and after she learned four years later he had done it again. Ogg told police, "Nobody gave [her] a number" but she believed it "probably" happened on a "few" or "several" other occasions. A reasonable inference is that Ogg would believe the abuse would continue as long as Daniel had access to A. R., and that there were more than three incidents of abuse.

The trial court properly instructed that the jury could not convict Ogg unless it found she "knew that Daniel Ogg was continuously sexually abusing [A. R.]." The court further instructed that "continuous sexual abuse" requires "three or more acts of substantial sexual conduct or lewd or lascivious conduct with the child." Ogg admitted to police that she believed Daniel probably molested A. R. on "a few" or "several" occasions. She had "no good reason" for not reporting the abuse, and predictably it continued.

*Instructions on Aiding and Abetting*
*Continuous Sexual Abuse of a Child*

Ogg contends that the trial court erred by not instructing sua sponte that the jury could not find her guilty of aiding and abetting the continuous sexual abuse of a minor unless it found that she knew Daniel committed three or more acts of sexual

8

molestation. She has forfeited this argument because she did not request the instruction in the trial court. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168-1169.)

Ogg's counsel did not render ineffective assistance because he did not request a clarifying instruction. The instructions were complete and the result would not have been different given further clarification.

*Effectiveness of Defense Counsel's Argument*

Ogg contends that her trial counsel rendered ineffective assistance by arguing against her in his closing argument by asserting that she only had "to know what's happening" and conceding that she knew of the sexual abuse in 2002.

We review Ogg's claim by assessing counsel's overall performance throughout the case, evaluating it from counsel's perspective at the time of the alleged error and in light of all the circumstances. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) Faced with Ogg's recorded admission, counsel made a valid tactical choice to concede knowledge of one incident to challenge the allegation that Ogg knew of the continuous abuse. Defense counsel argued that Ogg was not guilty because she did not know or have reason to know that Daniel continued to sexually abuse A. R. after the single incident when A. R. was 10 years old. Counsel did not argue that Ogg "only" had to know what was happening in 2002. He argued that the requirements were "spelled out in the jury instructions. . . . [¶] She has to know that it's happening. . . ." He argued that Ogg only knew about one incident in 2002 and that she reasonably believed Daniel's promise that it would not happen again and A. R.'s assurances that it had not. He argued that Ogg tried to protect A. R. by "separat[ing] the child and Daniel for months," and by checking with her that nothing more had happened. He argued, "She's made the admissions about what Daniel told her. Why, then, having said that, would she suddenly decide that nothing else had happened if, in fact, it had, if, in fact, she knew?" Counsel did not render ineffective assistance. (*People v. Vines* (2011) 51 Cal.4th 830, 876 [in examining a claim of ineffective assistance of counsel, reviewing court defers to counsel's reasonable tactical decisions and strong presumption exists that counsel's conduct falls within wide range of reasonable professional assistance].)

9

*Testimony and Argument about the "Pickle Incident"*

*and the CPS Investigation*

Ogg contends the trial court abused its discretion when it admitted "hearsay" evidence regarding the "pickle incident" and the CPS investigation. She also argues that counsel's assistance was ineffective when he did not object to the prosecutor's closing argument that the evidence proved a point for which it was not admitted.

Dole testified that Daniel said he played a "food game" with P. in which he put a pickle in her mouth and P. thought it was a penis. The trial court admitted the evidence to corroborate the testimony of [A. R.] "that another little girl . . . went through something similar and that [Daniel] . . . was concerned enough about this to put this story out to the little girl's mother to deflect suspicion." The prosecution offered Dole's testimony for the same purpose. This evidence was offered not for its truth but for its falsity. The court ruled, "[T]he People are not admitting it to prove that it's true, but . . . it's a lie put forward by a . . . child molester to defray suspicion about what he was doing . . . ." A statement is not hearsay when offered to show the statement is false. (*People v. Mendoza* (1987) 192 Cal.App.3d 667, 672-673.)

There was no objection to the prosecutor using the "pickle incident" to argue Ogg's knowledge. The prosecutor argued that Ogg knew of P.'s allegation, as well as A. R.'s allegations, but continued to ignore the abuse. The prosecutor exaggerated the evidence, arguing that Ogg knew Daniel had put his penis in P.'s mouth. When defense counsel argued that CPS concluded that P.'s allegation was unfounded, the prosecutor responded in rebuttal that "[i]t's not the first time, probably, something has fallen through the cracks with [CPS]," and "I wonder if [Ogg] told [CPS] that Daniel told her that he molested [A. R.]? No, she didn't. . . . [T]hey didn't even have all the information of what Daniel was doing molesting other children because [Ogg] kept that to herself." Defense counsel objected to the last statement, on the ground that it assumed facts not in evidence. The court properly overruled that objection. There was evidence Ogg was aware of the CPS investigation and Ogg told the police investigator that she did not tell anyone about

Daniel's admission. The court reminded the jury that inferences are to be drawn from the evidence.

Ogg forfeited review for prosecutorial misconduct because her trial counsel did not object to the prosecutor's statements. (*People v. Stewart* (2004) 33 Cal.4th 425, 502.) She contends her counsel was ineffective because he did not object.

Ogg has not demonstrated that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, or that she was prejudiced by counsel's unprofessional errors. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.) We accord great deference to counsel's reasonable tactical decisions, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*People v. Vines, supra,* 51 Cal.4th 830, 876.) Here counsel made a reasonable tactical decision to use the outcome of the CPS investigation to disprove Ogg's knowledge. The defense theory was that Ogg knew of only one incident in 2002 and had no reason to believe Daniel molested A. R. after 2002. Counsel argued that Ogg could have reasonably believed Daniel was not engaged in continuous abuse because Dole's allegation about P. was proven false in 2003. Ogg told police that she knew about the CPS investigation and that it "was proven that [Daniel] never, ever, ever touched P." Defense counsel argued that CPS concluded that the allegations were unfounded and this "supports my client's position. Because the question is, Was Daniel molesting [P.]?' [¶] 'Answer: No.'" It is not reasonably probable that the result would have been more favorable had counsel objected to the use of the evidence. (*Id.* at pp. 875-876.) Its impact on the question of Ogg's knowledge was ambiguous, and independent evidence that she knew Daniel was molesting A. R. was overwhelming.

*Sentencing*

Ogg contends the trial court abused its discretion when it denied probation and imposed the upper term.

We review a trial court's sentencing choice for an abuse of discretion, and reverse only when there is a clear showing the sentence is arbitrary or irrational. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) Ogg was statutorily ineligible for probation, as

11

defense counsel conceded at sentencing. Section 1203.066, subdivision (a)(8), provides that probation shall not be granted to a person "who, in violating Section 288 or 288.5, has substantial sexual conduct with a victim who is under 14 years of age." Section 1203.066 applies to aiders and abettors who have no sexual contact with a child. (*People v. Manners, supra,* 180 Cal.App.3d 826, 833.) The jury found Ogg guilty of substantial sexual contact "as alleged" in count 1.

It is true that the prosecutor did not allege that Ogg was ineligible for probation and that the jury made no special jury finding concerning "substantial sexual contact." Nevertheless, the trial court did not abuse its discretion in denying probation. If a "person is convicted of a violation of Section 288 or 288.5, and the factors listed in subdivision (a) are not pled or proven, probation may be granted only" if specific terms and conditions are met, including that probation is in the best interests of the child and that the defendant is amenable to treatment. (§ 1203.066, subd. (d)(1).) Ogg minimized her responsibility at sentencing, and did not demonstrate she was amenable to treatment. Ogg's incarceration would not undermine A. R.'s best interests because she was 18 years old and had been in foster care for two years. The trial court stated that "[i]f probation were an option, it would be denied given the circumstances of the case." The trial court did not abuse its discretion given Ogg's demonstrated inability to protect the best interests of A. R. and her failure to accept responsibility for the harm to her daughter.

The trial court did not abuse its discretion when it selected the upper term. (§ 1170, subd. (b).) The aggravating factors outweighed the sole mitigating factor of Ogg's lack of a prior criminal record. She knew Daniel molested A. R. and demonstrated indifference about her daughter's welfare. Ogg used her position and parental influence to dissuade her daughter from reporting the abuse.

The trial court did not rely on factors outside the record when it agreed with the prosecution that Ogg was probably "sociopathic." The comment was gratuitous. The court qualified it by stating it was not an expert and was "in no position to diagnose that." Read in context, the record establishes that Ogg's psychological condition was not among the aggravating factors upon which the court relied when it imposed the upper term.

12

Counsel did not render ineffective assistance by failing to object to the trial court's sentencing decisions. There is no reasonable probability that objections would have yielded a more favorable result. (*People v. Vines, supra,* 51 Cal.4th 830, 875-876.)

*AIDS Education Fee*

The AIDS education fee was unauthorized, as respondent concedes. Section 288.5 is not among the enumerated offense to which the AIDS education fee applies. (§ 1463.23.)

DISPOSITION

The judgment is modified to strike the AIDS education fee and is otherwise affirmed. The trial court shall amend the abstract of judgment to eliminate the AIDS fee and forward the certified amended abstract of judgment to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION.


GILBERT, P.J.


We concur:


YEGAN, J.


PERREN, J.

13

James P. Cloninger, Judge

Superior Court County of Ventura

_____

Law Offices of Danalynn Pritz, Danalynn Pritz, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Roberta L. Davis, Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.