Filed 8/29/13  P. v. Myles CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C066505 |
| v. | (Super. Ct. No. 05F05593) |
| ORLINDO ANTONIO MYLES, | |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C066506 |
| v. | (Super. Ct. No. 05F05593) |
| KRISTOPHER SPEIGHT, | |
| Defendant and Appellant. | |

Defendants Orlindo Antonio Myles and Kristopher Speight were tried together with separate juries. A jury convicted Myles of first degree residential burglary; first degree robbery; assault with intent to commit rape, oral copulation, sexual penetration or sexual penetration in concert; sexual penetration; and sexual penetration in concert. The jury also found true allegations that Myles committed the sexual offenses during a first degree burglary and that he tied or bound the victim in the commission of the sexual offenses, qualifying him for harsher punishment under the one strike law.

A different jury convicted Speight of first degree residential burglary; first degree robbery; sexual penetration; and sexual penetration in concert. The jury also found true allegations that Speight committed the sexual offenses during a first degree burglary and that he tied or bound the victim in the commission of the sexual offenses, qualifying him for harsher punishment under the one strike law.

The trial court sentenced Myles to a determinate term of seven years four months in prison plus a consecutive indeterminate term of 25 years to life. It sentenced Speight to a determinate term of three years in prison plus a consecutive indeterminate term of 25 years to life.

In part I of this opinion we discuss the appellate contentions asserted by Myles. Myles contends (A) his trial counsel provided ineffective assistance by not moving to exclude Myles's jury when Speight testified in his own defense and implicated Myles; and (B) the trial court erred in instructing the jury with CALCRIM No. 335, because the direction that Speight was an "accomplice" undermined Myles's defense that Speight was the primary offender.

We will affirm the judgment against Myles, but we will direct the trial court to correct the abstract of judgment to indicate that Myles was convicted on count five of sexual penetration in concert, not rape in concert.

In part II of this opinion we will discuss Speight's appellate contentions. Speight argues (A) there is insufficient evidence to sustain his conviction for sexual penetration in

2

concert as an aider and abettor; (B) the trial court erred in instructing the jury on the meaning of the words "in concert"; (C) if the conviction for sexual penetration in concert (count five) is allowed to stand, the conviction for sexual penetration (count four) must be stricken because it is a necessarily included offense; (D) the trial court erroneously instructed the jury that Speight's testimony required corroboration; (E) the trial court gave an argumentative instruction on aiding and abetting; (F) the trial court erred in failing to instruct sua sponte on the lesser included offenses of battery and sexual battery in connection with the charge of sexual penetration; (G) because Speight did not commit any sexual offense, the one strike finding that he committed a sexual offense during the commission of a burglary is not supported by the evidence; (H) because Speight did not commit any sexual offense, the one strike finding that he tied or bound the victim in the commission of a sexual offense is not supported by the evidence; (I) the trial court erroneously believed consecutive sentences were mandatory and hence did not exercise informed discretion; (J) the sentence of 25 years to life constitutes cruel and/or unusual punishment in this context; (K) Speight's trial counsel provided ineffective assistance; and (L) the abstract of judgment must be corrected to reflect that Speight was convicted on count five of sexual penetration in concert, not rape in concert.

We will dismiss the conviction on count four for sexual penetration, and lift the stay of execution of sentence on the count five conviction for sexual penetration in concert. We will remand the matter to the trial court to resentence Speight on count five. We will affirm the judgment in all other respects. We will also direct the trial court to amend and correct the abstract of judgment.

3

## BACKGROUND

On June 8, 2005, the 14-year-old victim was at home alone with her two-year-old sister when Myles and Speight entered the home.[1] The victim said Myles wore a red sweatshirt and Speight wore a blue sweatshirt.

Speight grabbed the victim's arm and placed his arm around her neck, putting her in a headlock. Myles later also grabbed the victim, holding her tightly around her torso. While holding her, Myles groped the victim's breasts and tried to put his hands down her pants. The victim yanked Myles's hand away and tried to grab his wrists to free herself from his hold. Myles grabbed the victim's wrists and pushed her toward her parents' bedroom where Speight had gone.

The victim's sister was asleep on her parents' bed. The victim told defendants not to touch her sister. Myles responded, "As long as you cooperate, we wouldn't do anything [to her]." Speight was in the room when Myles made this threat "loud enough to hear" and Speight repeated almost the same statement made by Myles. Speight then rummaged through the things in the parents' bedroom.

Myles brought the victim to a bedroom across the hall. He took a digital camera and gave it to Speight, who placed it in a backpack and then left the bedroom.

Myles kissed the victim, lifted her shirt, and sucked on her nipples. He held the victim's hands above her head and tried to take off her pants and underwear. The victim resisted, biting Myles on his right forearm and kicking him in the groin. Myles punched the victim in the face and the top of her head three times with a closed fist, causing her nose to bleed.

Myles then took the victim to her brothers' bedroom. Speight was not in that room. Myles threw the victim onto the bottom bunk of the bunk bed in the room. He

---

[1] All dates refer to 2005 unless otherwise indicated.

4

took his penis out of his pants and told the victim to suck it. The victim refused. Myles then ripped off the victim's bra, pulled down her pants and underwear, grabbed, kissed and sucked her breasts, tried to force himself on top of her and, using his hands, forced her to open her legs. The victim resisted and tried to get Myles off her. Her pants and underwear were around her ankles.

At some point in time, Speight appeared at the doorway of the bedroom, looked inside and said "Come on. We gotta go. Her brothers are going to be home soon." Speight did not do or say anything to stop Myles from harming the victim.

Myles picked the victim up and took her into the hallway. The victim struggled to get out of his hold. Her pants and underwear were around her ankles. Speight was also in the hallway, in a position where he could see the victim struggling against Myles. Myles threatened to hit the victim with a wooden CD (compact disc) rack as the victim continued to struggle.

Myles told Speight to get something to tie the victim up with. Speight left the hallway and returned with a cord in his hands. The victim began to fight harder when she saw the cord, but she fell to the floor and ended up on her stomach. Both defendants were on top of her tying her down. The victim could not see which person actually tied her up. Her hands were tied very tightly behind her back so that she could not move her hands.

After she was tied up, Myles pulled the victim to her feet. He put his fingers inside the victim's vagina and said, "Tell me it feels good." Speight was not in the hallway at that point. The victim was unable to stop Myles because her hands were bound, and she felt completely helpless.

After he digitally penetrated her, Myles brought the victim, still tied up, back to her parents' bedroom. The victim's sister was still asleep. Speight took the victim's Playstation 2 console from her parents' bedroom. He told Myles, "Leave her alone. We gotta go."

5

The victim managed to dial 911 after defendants left. The entire occurrence, from the time defendants entered the victim's home to the time they left, took about 10 to 15 minutes.

That same day, child abuse evidence collector Ana Ross saw bruises on the victim's nose, dried blood under her nose, redness on her neck and arms, and ligature marks on her wrists. Ross also observed redness on the victim's hymen, which Ross testified was consistent with a sexual assault.

In Myles's backpack, police found a camera taken from the victim's house. Myles also had what appeared to be a puncture mark on his right forearm. In DNA testing of a saliva swab taken from the victim's left breast, Myles was determined to be a contributor.

Speight was eliminated as a contributor for the DNA sample taken from the victim's breast. But Speight resembled the composite sketch of one of the intruders that was prepared based on the victim's description.

Police detectives interviewed Speight three times. Speight lied to police about his whereabouts on June 8 during the first two interviews. On June 14, police detectives interviewed Speight a third time. Speight told detectives that Myles came up with the idea to "hit" the victim's house but Speight agreed to go with Myles; Myles tricked the victim into letting defendants into her house; Myles hit the victim; and Myles directed Speight to take various items from the house. Speight also said he saw the victim's pants pulled down, heard Myles say "I'm about to fuck her," and realized that Myles was probably trying to rape the victim. According to Speight, he objected and told Myles to leave the victim alone. But Speight admitted that Myles instructed him to tie the victim up and Speight complied by wrapping a cord around her arms. Speight did not tell police that he escorted the victim out of the room after Myles announced his intent to rape her.

At two live lineups on June 18, the victim identified Speight and Myles as her assailants. The victim was certain that Myles was the person who sexually assaulted her.

6

A second amended information charged defendants with first degree residential burglary (Pen. Code, § 459 -- count one);[2] first degree robbery (§ 211 -- count two); assault with intent to commit rape, oral copulation, sexual penetration, or sexual penetration in concert (§ 220, subd. (b) -- count three); sexual penetration (§ 289, subd. (a)(1) -- count four); and sexual penetration in concert (§ 264.1 -- count five). It was alleged in counts four and five that defendants committed the charged sexual offenses during a first degree burglary and that defendants tied or bound the victim in the commission of the sexual offenses (§ 667.61, former subd. (e)(6), now subd. (e)(5)).

Defendants were tried together but with two juries. Speight testified at trial. Myles did not testify.

Speight provided the following account about what happened on June 8: Myles asked Speight whether he knew of any houses to "hit" for a portable video game called "PSP." Speight showed Myles the victim's house. Although he was initially reluctant, Speight agreed to help Myles burglarize the house.

Speight rang the doorbell of the house to check whether anyone was at home. He was surprised when the victim answered the door. But Speight did not tell Myles that he did not want to go forward with their plan to burglarize the house.

Myles told Speight to find out whether anyone else was at home. Speight complied when Myles said he would go with Speight. They returned to the house together. Speight asked the victim if her parents were home. She responded that they were at work. Speight and Myles then left.

Myles told Speight they were going to "rush" into the house, grab the victim, and "hit" the house. Speight refused, but Myles convinced him to go back once more. Speight and Myles returned to the victim's house and rang the doorbell again. They

---

[2] Undesignated statutory references are to the Penal Code.

7

asked the victim to call them if she saw Speight's brother because they needed him to go home.  The victim invited Speight and Myles into the house.

The victim was writing down a fake telephone number that Speight gave her when Myles yelled "Grab her."  The victim hit Speight on the side of the head.  Speight grabbed the victim's arms to stop her from hitting him and Myles hit the victim.  Myles grabbed the victim and placed his arm around her neck.

When Speight saw Myles hit the victim, he "froze."  He did not expect that Myles would hit the victim, but he wanted "to go along with it and just get it done" so that they could leave the house.  Speight was afraid because, even though Myles never threatened him, he thought Myles might try to hit him.

Pursuant to instruction from Myles, Speight took a camera that was on the kitchen counter.  Speight proceeded to the first bedroom he saw, the parents' bedroom, and looked around for the PSP.  He then went across the hall to the next bedroom, thinking the PSP would more likely be in a kid's bedroom.

In the second bedroom, Speight saw Myles, with his back to Speight, leaning over the victim "like he was on top of her."  Speight saw the victim's shirt pulled up and her breasts were visible.

Speight told Myles he did not think the PSP was in the parents' bedroom.  Myles asked the victim if there were any guns or money in the house.  The victim answered no.  Myles then picked the victim up and said he was going to a back room.  The victim struggled with Myles.

Speight looked around the second bedroom for the PSP but did not find it.  He returned to the parents' bedroom, where he looked around for money and other things.  The telephone rang and Speight noticed the victim's sister on the bed.  Speight denied threatening to hurt the victim's sister and denied hearing Myles threaten to hurt her.  Speight panicked when he saw the victim's sister and went to search for Myles in the back bedrooms.

8

Standing at the doorway of one of the back bedrooms, Speight saw the victim sitting on a bunk bed with her pants around her legs and Myles kneeling in front of her. Myles said he was about to "fuck her." After Speight learned that Myles intended to rape the victim, Speight tried to get out of the house as fast as he could; he told Myles to leave the victim alone and they needed to leave the house. Speight entered the bedroom, grabbed the victim by the shoulders and pants and pulled her up while trying to pull up her pants. He pulled her into the hallway.

Myles stopped Speight and said they needed something to tie up the victim so she did not call the police. Speight grabbed an electrical cord. The victim struggled with Myles and Myles hit her in the stomach, causing her to fall to the ground. The victim continued to fight and Myles threatened to hit her with a CD rack. Speight instructed the victim to stop struggling. He gave the cord to Myles and Myles used it to bind the victim. Speight denied that he tied up the victim.

After the victim was bound, Speight returned to the parents' bedroom. He told Myles to bring the victim to the parents' bedroom and to put the victim on the bed. Myles took a camera and asked Speight to take a Playstation 2 console. Speight and Myles ran from the victim's house together.

Speight was not truthful with police when they interviewed him, and he tried to downplay his role in the incident.

The Myles jury found Myles guilty on all counts and found all of the one strike allegations to be true. The Speight jury found Speight guilty on all counts except count three, and it found all of the one strike allegations in counts four and five to be true.

The trial court sentenced Myles as follows: the upper term of six years in prison on count two (the principal term); a consecutive one year four months on count one; a consecutive indeterminate term of 25 years to life on count four; a concurrent indeterminate term of life with the possibility of parole on count three; and an

9

indeterminate term of 25 years to life on count five, stayed pursuant to section 654; for a total aggregate term of seven years four months plus 25 years to life in prison.

The trial court sentenced Speight as follows:  the lower term of three years in prison on count two (the principal term); four years on count one, stayed pursuant to section 654; a consecutive indeterminate term of 25 years to life on count four pursuant to section 667.6, subdivision (d); and 25 years to life on count five, stayed pursuant to section 654; for a total aggregate term of three years plus 25 years to life.

DISCUSSION

PART I -- MYLES

A

Myles contends his trial counsel provided ineffective assistance by not moving to exclude Myles's jury when Speight testified in his own defense and implicated Myles. According to Myles, his primary defense was that he was not one of the intruders; his alternate defense was that he was not the primary offender.  But Speight's defense was that Myles was the primary offender.  Speight testified accordingly in front of both juries.[3]

_____

[3]  Counsel for Myles moved to sever the trial or, in the alternative, empanel two juries. The trial court ordered separate juries.  Myles's motion was made pursuant to *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476], which stand for the proposition that a non-testifying codefendant's extrajudicial statement that inculpates defendant is generally inadmissible because it violates defendant's constitutional right of confrontation and cross-examination, even if a limiting instruction is given. (*People v. Jennings* (2010) 50 Cal.4th 616, 652.)  In his reply brief on appeal, Myles agrees that any confrontation clause concern regarding Speight's pretrial statements was dispelled when Speight testified and Myles had an opportunity to confront and cross-examine Speight.  (*People v. Dement* (2011) 53 Cal.4th 1, 23-24; *People v. Steger* (1976) 16 Cal.3d 539, 551 [court did not err in admitting pretrial statement of codefendant who testified at trial]; *People v. Sosa* (1972) 26 Cal.App.3d 514, 517-518 [admission of codefendant's testimony about his pretrial statements was not error where codefendant was available at trial for "full and effective" cross-examination]; *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d

10

Myles cites "general authorities" for the proposition that "the failure to object to damaging and inadmissible testimony or to make appropriate motions can be the basis for a conclusion that counsel was incompetent." But those general authorities are not dispositive here because they do not involve a trial counsel's failure to object to the testimony of a codefendant before the jury of a jointly tried defendant.

Myles claims *People v. Wardlow* (1981) 118 Cal.App.3d 375 (*Wardlow*) illustrates how a dual jury trial should be conducted. But Myles concedes that the court in *Wardlow* did not consider the precise issue presented here; Myles has been unable to find a published California case on point. Thus, Myles turns to cases from other states. He cites a Florida case, *Watson v. State* (Fla.Dist.Ct.App. 1994) 633 So.2d 525, which involved defendants who were tried together with separate juries (*id.* at pp. 525-526), but that case does not assist him. Although the Florida appellate court determined, without explanation, that it was error to permit defendant Watson's jury to remain in the courtroom during eyewitness testimony exculpating codefendant Tomingo but inculpating Watson (*ibid.*), the appellate court nonetheless affirmed the judgment against Watson because his trial counsel did not *ask* that Watson's jury be excused during Tomingo's case, and, in any event, the eyewitness testimony against Watson did not render his trial illegal. (*Id.* at p. 526.)

Myles also cites an Illinois case, *People v. Rodriguez* (Ill.Dist.Ct.App. 1997) 680 N.E.2d 757, 767, but that case is distinguishable. It involved the violation of a defendant's Sixth Amendment rights where a jointly tried codefendant cross-examined defendant in the presence of defendant's jury. Here, Myles did not testify and there is no contention that Myles was precluded from presenting evidence in his case.

177, 197] [when codefendant/declarant appears at trial and is subject to cross-examination by defendant, the confrontation clause places no constraints on the use of codefendant's prior testimonial statements].)

11

Ultimately, Myles fails to specify why Speight's testimony was inadmissible against Myles, and he fails to specify the particular grounds upon which his trial counsel should have objected.  This failure is fatal to his ineffective assistance claim.  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 114 [no basis to conclude that counsel erred in failing to object to admission of evidence where appellant offered no potential basis for objection that counsel might have overlooked]; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092 [failure to specify the grounds for objection and show its merits on appeal defeats ineffective assistance claim].)  Accordingly, we need not consider his other contentions because he fails to demonstrate error by his trial counsel.  (*People v. Maury* (2003) 30 Cal.4th 342, 389 [ineffective assistance of counsel claim requires proof that trial counsel's representation was deficient]; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] [same].)

B

Myles also contends the trial court committed instructional error.  According to Myles, although his counsel argued that Speight was the primary offender, the trial court nonetheless instructed the jury with CALCRIM No. 335, directing the jury that "[i]f any of the crimes charged, or the lesser included crime, were committed, then defendant Kristopher Speight was an accomplice to those crimes."[4]  Myles says the instruction undermined his defense that Speight was the primary actor.

Myles's premise -- that an accomplice is not a primary offender -- is incorrect.  For purposes of the CALCRIM No. 335 instruction, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant."  (§ 1111; *People v. Avila* (2006) 38 Cal.4th 491, 564; *People v. Felton* (2004) 122 Cal.App.4th 260, 268.)

---

**4**  Myles requested the CALCRIM No. 335 instruction during trial.  But he argues his contention on appeal is not forfeited because the error affected his substantial rights. (§ 1259.)

12

To be chargeable as an accomplice, a witness must directly commit the act constituting the offense or aid and abet in its commission. (*People v. Avila, supra,* 38 Cal.4th at p. 564.) "Under Penal Code section 1111 . . . , 'accomplice' is not synonymous with aider and abettor; a perpetrator can be an accomplice." (*People v. Felton, supra,* 122 Cal.App.4th at p. 269; see *People v. Belton* (1979) 23 Cal.3d 516, 523 [perpetrator of a crime is an accomplice].) Therefore, the instruction that Speight was an accomplice did not require the jury to find that Myles was the primary offender. In fact, the trial court instructed Myles's jury on aiding and abetting, explaining that Myles may be guilty of a crime as a direct perpetrator or an aider and abettor.

Myles concedes in his reply brief that defendants can both be accomplices. He nonetheless asserts that a reasonable jury would have assumed that the CALCRIM No. 335 instruction meant that Myles was not an accomplice but was the primary offender in the crimes. But this speculation finds no evidence in the record.

However, our review of the record discloses a clerical error in the abstract of judgment.[5] The abstract of judgment incorrectly states that Myles was convicted in count five of rape in concert, rather than sexual penetration in concert. We will direct the trial court to prepare a corrected abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

PART II -- SPEIGHT

A

Speight contends there is insufficient evidence to sustain his conviction for sexual penetration in concert as an aider and abettor. He asserts there is no evidence that he

---

[5] Although the parties did not raise this clerical error in their appellate briefs, the error and the remedy appear to be clear. Any party aggrieved may petition for rehearing. (Gov. Code, § 68081.)

knew of Myles's intent to commit sexual penetration, and no evidence that Speight intended to encourage or facilitate the commission of that offense.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We do not reweigh evidence or reevaluate a witness's credibility. (*Ibid.*)

Section 264.1 provides in pertinent part that "in any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim," commits the offense of sexual penetration, as described in section 289 [defining sexual penetration], either personally or as an aider and abettor, the defendant shall be sentenced to state prison. (§ 264.1, subd. (a).)

A defendant is guilty of sexual penetration in concert as an aider and abettor if (1) the direct perpetrator committed or attempted to commit the offense of sexual penetration, (2) the aider and abettor knew of the direct perpetrator's unlawful intent, (3) the aider and abettor intended to encourage and bring about the direct perpetrator's unlawful ends, and (4) the aider and abettor engaged in conduct that in fact assisted the achievement of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225-1227; *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497.)

14

Whether a defendant aided and abetted the commission of a crime is a question of fact which may be proved by circumstantial evidence. (*People v. Beeman* (1984) 35 Cal.3d 547, 559–560; *People v. Pitts* (1990) 223 Cal.App.3d 606, 892–893.) A number of cases have discussed the evidence sufficient to support such a conviction. (See, e.g., *People v. Pelayo* (1999) 69 Cal.App.4th 115, 120-121 [sufficient evidence where defendant facilitated the sexual penetration committed by cohort]; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530, 533-534 [defendants aided and abetted the perpetrators who actually committed the sexual offense]; *People v. Lopez* (1981) 116 Cal.App.3d 882, 884-885 [sufficient evidence where defendant's actions prior to rape showed he knew cohort's intent to rape and he helped cohort carry out plan]; *People v. Villa* (1957) 156 Cal.App.2d 128, 130-132, 135-137 [sufficient evidence where defendant's silence and lack of objection constituted tacit approval of sexual offense]; *People v. Shevette* (1950) 98 Cal.App.2d 782, 783-786 [sufficient evidence where defendant aided and abetted cohort].)

Here, the record establishes there was sufficient evidence from which the jury could reasonably find that Speight committed sexual penetration in concert as an aider and abettor. Acting together, Myles and Speight entered the victim's home and grabbed her. Myles groped the victim's breasts and attempted to put his hands down her pants the first time he grabbed her. To gain the victim's cooperation, defendants threatened to harm the victim's sister. Thereafter, Speight saw Myles on top of the victim in one of the bedrooms and saw that the victim's shirt was pulled up. Speight did not object to Myles's treatment of the victim but instead continued to carry out their plan to search the victim's house for the PSP, leaving Myles alone with the victim.

In one of the back bedrooms, Speight saw the victim with her pants pulled down around her legs and Myles kneeling in front of her. Myles told Speight he was about to "fuck her." Speight knew at that point that Myles intended to rape the victim. According to the victim, Speight did not pull Myles off her, did not object to what Myles said he

15

intended to do, and did not tell Myles to leave her alone. Instead, when Myles announced that he wanted to bind the victim, Speight gave Myles an electrical cord to use for that purpose and, according to the victim, helped restrain and bind the victim. The victim's testimony that Speight helped bind her is consistent with Speight's pretrial admission to police that he wrapped a cord around the victim's arms. After the victim's hands were bound, Myles digitally penetrated her vagina.

Although Speight was not in the hallway when Myles committed the offense of sexual penetration, the jury could reasonably conclude that Speight knew Myles intended to rape the victim, Speight's conduct evinced an intent to help Myles accomplish his stated purpose, and Speight's actions in fact helped Myles commit sexual penetration. (*People v. Pelayo, supra,* 69 Cal.App.4th at p. 121 [presence when the crime occurred is not required for aider and abettor liability]; *People v. Nguyen, supra,* 21 Cal.App.4th at pp. 529-530 [failure to take action to prevent a crime is a factor the jury may consider in assessing defendant's criminal responsibility], 531-532 [a person may aid and abet a criminal offense without prior agreement, and the primary offender need not expressly communicate his criminal purpose to defendant because that purpose may be apparent from the circumstances].)

Speight testified that he tried to stop Myles from raping the victim. He also testified that his reasons for helping Myles bind the victim did not include assisting Myles with sexual assault. But the jury was not required to believe Speight's testimony in that regard, and it clearly did not believe it. (*People v. Beeman, supra,* 35 Cal.3d at pp. 559–560; *People v. Villa, supra*, 156 Cal.App.2d at p. 136.)

Substantial evidence supports the jury's finding that all of the elements of sexual penetration in concert as an aider and abettor were established.

B

Speight next contends the trial court erred in instructing the jury on the meaning of the words "in concert." Convicted of sexual penetration in concert (§ 264.1 -- count

five), he argues CALCRIM No. 1046 describes "acting 'in concert' " in terms of "aiding and abetting" and does not adequately convey the requirement that the codefendants must act together in a concerted effort. Speight says the trial court's answers to jury questions on the subject merely reinforced the error. He claims the instructional error permitted the jury to convict him without proof that he acted in a concerted effort with Myles to commit the crime of sexual penetration.

Section 264.1 describes acting in concert with another person as either committing the offense personally, or aiding and abetting the other person. (§ 264.1; *People v. Jones* (1989) 212 Cal.App.3d 966, 969.) The trial court instructed the jury with CALCRIM No. 1046, explaining that the People must prove (1) defendant personally committed sexual penetration and voluntarily acted with someone else who aided and abetted its commission; or (2) defendant voluntarily aided and abetted someone else who personally committed sexual penetration.

When the jury subsequently asked what "in concert" means, the trial court responded that it means "together." The trial court adequately explained to the jury that in order to convict Speight of sexual penetration in concert, it must find that Speight and Myles acted together. (*People v. Jones, supra,* 212 Cal.App.3d at p. 969; *People v. Calimee* (1975) 49 Cal.App.3d 337, 341.) Consistent with the trial court's explanation, the prosecutor told the jury that the charge of sexual penetration in concert meant that Speight and someone else committed sexual penetration.

Speight nonetheless argues that proof of aiding and abetting does not necessarily establish that defendants acted in concert. Although acting in concert is not necessarily synonymous with "aiding and abetting" (*People v. Jones, supra,* 212 Cal.App.3d at p. 969), the evidence in this case supports the finding that Speight acted in concert with Myles by aiding and abetting his sexual penetration of the victim. (*People v. Wheeler* (1977) 71 Cal.App.3d 902, 906-907.) Speight was tried for sexual penetration in concert as an aider and abettor. The trial court told the jury that Speight was guilty of sexual

17

penetration in concert if the People proved that Speight voluntarily aided and abetted the commission of sexual penetration. That instruction correctly stated the law in the context of this case (§ 264.1, subds. (a), (b)(1) & (2) [defendant can be guilty of committing sexual penetration in concert as an aider and abettor]; *People v. Adams* (1993) 19 Cal.App.4th 412, 446 [active participation in the commission of the sexual act is not required for in concert finding]; *People v. Lopez, supra*, 116 Cal.App.3d at p. 884 [defendant need not personally participate in the physical act of the sexual offense for in concert liability to attach]) and did not negate the other jury instructions that Speight must act in concert or together with Myles in committing sexual penetration. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370 [we consider the instructions as a whole in determining a claim of instructional error].)

Speight claims that when the jury asked whether "together" means "physically or mentally," the trial court erred in responding that "together" does not mean "physically together." Speight says section 264.1 requires some physical action to assist the commission of the offense, not merely a "meeting of the minds" or "mental togetherness." But the trial court's response was correct. A defendant can act in concert without being physically present during the sexual act. (*People v. Champion* (1995) 9 Cal.4th 879, 933 [defendant committed a sexual offense in concert even though he was not in the room when the rape was committed where the conduct by the group of defendants helped in the commission of the rape], disapproved on another ground in *People v. Ray* (1996) 13 Cal.4th 313, 369, fn. 2; *People v. Lopez, supra*, 116 Cal.App.3d at p. 884 [defendant was properly convicted of forcible rape while acting in concert although he was not in the bedroom when his co-defendant raped the victim].) The trial court correctly told the jury that Speight did not have to be physically present in the hallway when Myles committed the act of sexual penetration for the jury to find that Speight acted in concert with Myles.

As for the requirement of some action by the aider and abettor to assist the commission of the offense, the trial court told the jury that the People must prove that Speight's words or conduct did, in fact, aid and abet the perpetrator's commission of sexual penetration. In response to jury question No. three, the trial court reiterated that someone aids or abets a crime if he "does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's . . . commission of that crime." Considering the instructions together, as we must on appeal (*People v. Fiu, supra,* 165 Cal.App.4th at p. 370), we find no reasonable likelihood the jury understood that it could convict Speight of sexual penetration in concert without finding concerted action by Speight and Myles and conduct by Speight which aided Myles in committing the crime of sexual penetration.[6]

Speight appears to argue in his reply brief that the offense of sexual penetration in concert requires a "gang sexual assault" or "group sexual attack." But a "gang-type sexual assault" is not required for an in concert sexual offense. (*People v. Champion, supra,* 9 Cal.4th at pp. 932-933 [defendant Ross was properly convicted of rape in concert even though none of his companions were in the bathroom when he raped the victim]; *People v. Green* (1985) 166 Cal.App.3d 514, 516-517 [sufficient evidence supported finding that defendant acted in concert in the commission of rape even though defendant was the only person who had sexual intercourse with the victim]; *People v. Lopez, supra,* 116 Cal.App.3d at p. 887 ["If the Legislature wanted to limit section 264.1 to gang rape with only the active participants being held culpable, it could easily have done so"]; *People v. Wheeler, supra,* 71 Cal.App.3d at pp. 906-907 [defendant acted in

---

[6] Speight was prosecuted as an aider and abettor on the count five charge of sexual penetration in concert. In their appellate briefs, the parties discuss the fact that the jury instructions pertaining to count five did not include an instruction on the natural and probable consequences doctrine of aiding and abetting. But we need not address that issue because Speight does not claim the omission was erroneous.

19

concert in the commission of rape even though his companion was the only person who had sexual intercourse with the victim].)

C

Speight further argues that if the conviction for sexual penetration in concert (count five) is allowed to stand, the conviction for sexual penetration (count four) must be stricken because it is a necessarily included offense. The Attorney General agrees that counts four and five are based on the same conduct and that commission of sexual penetration in concert necessarily includes the commission of sexual penetration.

Although multiple convictions are generally allowed, there is an exception for necessarily included offenses. (*People v. Medina* (2007) 41 Cal.4th 685, 701.) A lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense or the facts actually alleged in the accusatory pleading include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. (*Ibid*.) The logic behind the rule prohibiting convictions for both a greater offense and a necessarily included offense is that " '[i]f a defendant cannot commit the greater offense without committing the lesser, conviction of the greater is also conviction of the lesser. To permit conviction of both the greater and the lesser offense " ' "would be to convict twice of the lesser. " ' " [Citation.] There is no reason to permit two convictions for the lesser offense.' [Citation.] There is also no prejudice to the People if a court strikes, rather than stays, the conviction. If a greater offense is reversed on appeal, the lesser included offense may be revived by operation of law. [Citations.]" (*Id.* at p. 702, italics omitted.)

Sexual penetration in concert pursuant to section 264.1 requires sexual penetration as described in section 289. (§ 264.1, subd. (a).) Accordingly, the crime of sexual penetration in concert necessarily includes the crime of sexual penetration. Because we affirm the conviction for sexual penetration in concert (count five), we will dismiss the conviction for sexual penetration (count four). (*People v. Medina, supra*, 41 Cal.4th at p.

20

702.)  And because we will dismiss the conviction in count four, we will lift the stay of execution of sentence on count five, which the trial court ordered pursuant to section 654.

D

Speight next claims the trial court erroneously instructed the jury that his testimony required corroboration.  He says this was error because the trial court also instructed the jury that it could convict Speight based solely on the victim's uncorroborated testimony.  Speight argues those instructions undermined his constitutional right to testify and to present evidence in his defense, and suggested his testimony was entitled to less weight and should not be trusted.  He claims the instructional error was not harmless beyond a reasonable doubt under the standard enunciated in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].  The Attorney General does not dispute instructional error, but argues any error was harmless.

The trial court instructed the jury pursuant to CALCRIM No. 301, stating: "Except for the testimony of Defendant Kristopher Speight, which requires supporting evidence, the testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."[7]

Speight cites cases in which a trial court told the jury that a testifying defendant is an accomplice whose testimony must be viewed with caution or distrust.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103-105; *People v. Alvarez* (1996) 14 Cal.4th 155, 217-219; *People v. Fowler* (1987) 196 Cal.App.3d 79, 85-88.)  Those cases are

---

[7]  The trial court also instructed the jury with CALCRIM No. 1190, stating:  "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."  CALCRIM No. 1190 is a correct statement of law.  (*People v. Gammage* (1992) 2 Cal.4th 693, 700 [construing CALJIC No. 10.60 which is similar to CALCRIM No. 1190].)  It declares a substantive rule of law and does not give greater weight to the victim's testimony or dilute the prosecution's burden of proof.  (*Ibid.*)

distinguishable.  Here, the trial court did not instruct Speight's jury that Speight was an accomplice whose testimony must be viewed with caution or distrust; rather, it instructed the jury that if any of the charged crimes were committed, Myles was an accomplice to those crimes, and any statement by Myles that tended to incriminate Speight should be viewed with caution.

Nonetheless, even if it was error to instruct the jury pursuant to CALCRIM No. 301, we conclude the error was harmless beyond a reasonable doubt because the evidence overwhelmingly established Speight's guilt on count five, sexual penetration in concert.[8]

Among other things, the trial court directed the jury to impartially compare and consider all the evidence, and it instructed them that unless the evidence proved Speight guilty beyond a reasonable doubt, the jury must find Speight not guilty.  We presume the jurors understood and followed the trial court's instructions.  (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

The victim testified to the following:  two males entered her house and grabbed her; Myles hit her and sexually assaulted her but she fought him off; Myles told Speight to find something with which to tie the victim; Speight found a cord to use; the victim was rendered helpless after her hands were bound; Speight left her in the hallway with Myles after she was bound; and Myles then digitally penetrated her vagina.

Speight's testimony corroborated the victim's testimony.  Speight testified that he and Myles, acting together, gained entry to the victim's house by trickery with a plan to steal a PSP; Myles hit the victim multiple times; in one of the bedrooms, Myles was on top of the victim and the victim's shirt was pulled up, revealing her breasts; in another bedroom, the victim was on the bed with her pants around her legs and Myles knelt in

---

**8**  Because we will dismiss the conviction on count four for sexual penetration (as we have already explained), we do not address Speight's additional contentions pertaining to that count.

front of the victim; Myles said he was about to "fuck her"; the victim fought Myles; Myles asked for something to use with which to tie the victim; Speight gave Myles an electrical cord to use; and after the victim was bound, Speight left her in the hallway with Myles. Speight acknowledged that binding the victim rendered her helpless against Myles's subsequent sexual assault.

The victim's testimony about the sexual assault was also corroborated by DNA evidence, the puncture mark observed on Myles's forearm on June 14, and the testimony of Ana Ross regarding the victim's injuries. The victim's testimony was also corroborated by the victim's statements to Ross on June 8 that there were two assailants, one of the assailants penetrated the victim's vagina with his finger, and both assailants threatened to hurt the victim's sister.

In addition, Speight's pretrial statement to police corroborated the evidence that Speight acted in concert with Myles and aided and abetted Myles in the commission of sexual penetration. The trial court instructed the jury that if it decided that a witness made a statement before trial, the jury could use the statement to evaluate whether the witness's testimony in court was believable and as evidence that the information in the earlier statement was true. The trial court also instructed the jury that it must decide how much importance to give pretrial statements and to consider such statements along with all the other evidence in reaching its verdict.

Speight told police that defendants entered the victim's house together to steal a game; they grabbed the victim; Myles hit the victim; Myles took the victim's pants off; Myles told Speight, "I'm about to fuck her" or "I'm about to rape this bitch" and the victim responded "no" or "don't"; Speight knew Myles was trying to rape the victim; thereafter Speight got a cord and wrapped it around the victim's arms when they were in the hallway; and Speight and Myles ran from the victim's house together.

Although Speight denied at trial that he tied the victim, he repeatedly told police that he did. The jury found that Speight engaged in the tying or binding of the victim.

23

The evidence overwhelmingly established Speight's guilt on count five, sexual penetration in concert. Based on the entire record, we conclude beyond a reasonable doubt that any error in instructing the jury pursuant to CALCRIM No. 301 did not contribute to the jury's findings on count five.

E

Speight next contends the trial court gave an argumentative instruction on aiding and abetting.

Over Speight's objection, the trial court gave the following special instruction to the jury: "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, flight, and conduct before and after the offense."

Speight claims the special instruction was argumentative and invited the jury to draw inferences favorable to the prosecution. He says the instruction implied that the cited factors were to be accorded weight, thereby violating his federal due process right to have the jury decide the issue of guilt or innocence.

This court rejected a similar argument in *People v. Battle* (2011) 198 Cal.App.4th 50, 84-85 (*Battle*). The trial court in that case gave the same instruction as the one challenged here. (*Id.* at p. 84.) One of the defendants argued that the instruction was argumentative and invaded the province of the jury. (*Ibid.*) This court disagreed, holding that the instruction merely listed factors which the jury could consider. (*Id.* at p. 85.) We reach the same conclusion here.

" 'An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.]' [Citation.] An argumentative instruction is ' "an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " [Citation.]' [Citation.]" (*Battle, supra*, 198 Cal.App.4th at p. 85.) The special instruction on aiding and abetting in this case is not argumentative

24

because it merely listed factors in a neutral fashion, without referring to specific items of evidence. The instruction stated that the jury "may" consider the listed factors and did not suggest that any factor should be given any particular weight or that the jury should apply any particular factor in favor of or against finding Speight an aider and abettor. An instruction that lists relevant factors for the jury to consider in a neutral manner and that does not "take a position as to the impact" of each of the factors listed is proper. (*People v. Martinez* (1999) 20 Cal.4th 225, 237; *People v. Wright* (1988) 45 Cal.3d 1126, 1138-1141, italics omitted; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 805, 809-810.)

Speight relies on *People v. Mouton* (1993) 15 Cal.App.4th 1313, but that case is inapposite. Unlike here, the challenged instruction in that case listed the prosecution evidence. (*Id.* at p. 1321.) Likewise, the instructions challenged in *People v. Smith* (1977) 67 Cal.App.3d 45, 49-50, *People v. Wright, supra,* 45 Cal.3d at p. 1135 and *People v. Panah* (2005) 35 Cal.4th 395, 485-486 are also distinguishable because they focused on specific items of evidence, such as the testimony of particular witnesses, and told the jury how such evidence should be considered.

Although Speight argues otherwise, the special instruction challenged here did not draw the jury's attention away from the aiding and abetting elements set forth in CALCRIM No. 401. The trial court instructed Speight's jury that the People must prove those elements. Nothing in the special instruction suggested that the listed factors relieved the prosecution of its burden of proof. In fact, in his closing argument the prosecutor reviewed the CALCRIM No. 401 elements, and did not argue that the factors listed in the special instruction replaced those elements.

Speight claims the special instruction was misleading because the cited factors bear little relevance to determining whether he aided and abetted Myles in the commission of the sexual offenses. We disagree. The factors listed in the challenged instruction are relevant to whether defendant is an aider and abettor. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *People v. Chagolla* (1983) 144 Cal.App.3d 422, 429;

25

*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094–1095.)  Unlike the instruction condemned in *People v. Mouton, supra,* 15 Cal.App.4th 1313, the instruction in this case did not include irrelevant factors.  (See *Battle, supra*, 198 Cal.App.4th at p. 85.)  Based on the evidence, Speight's jury could rationally find that Speight aided and abetted the commission of sexual penetration in concert.  (See *People v. Jones, supra*, 212 Cal.App.3d at 970; *People v. Lopez, supra*, 116 Cal.App.3d at pp. 884-885; *People v. Wheeler, supra*, 71 Cal.App.3d at p. 906.)

Speight's challenge to the special instruction lacks merit.

F

Speight claims the trial court erred in failing to instruct sua sponte on the lesser included offenses of battery and sexual battery in connection with the charge of sexual penetration.  Although he did not request lesser included offense instructions for count four (sexual penetration) or count five (sexual penetration in concert), he claims the trial court nonetheless had a sua sponte duty to instruct on lesser included offenses because the jury could have found, under the natural and probable consequences doctrine, that battery and sexual battery were reasonably foreseeable consequences of first degree burglary, while sexual penetration was not.

Speight was prosecuted under the natural and probable consequences theory of aiding and abetting on count four, but not on count five.  Because the claim of instructional error applies only to count four, and because we have already concluded that the conviction on count four must be dismissed, we do not address this claim of instructional error.

G

Speight further argues that because he did not commit any sexual offense, the one strike finding that he committed a sexual offense during the commission of a burglary is not supported by the evidence.  He challenges the jury's finding, made pursuant to section 667.61, subdivision (e)(2) (section 667.61(e)(2)), that he committed the crimes of

26

sexual penetration and sexual penetration in concert during the commission of a burglary. He claims the finding must be reversed because section 667.61(e)(2) applies only to those who personally commit an enumerated sexual offense, not to aiders and abettors, and there is no evidence that he personally committed a sexual offense during a burglary.

In construing a statute, our principal task is to ascertain the intent of the Legislature so as to effectuate the statute's purpose. (*People v. Jones* (1993) 5 Cal.4th 1142, 1146; *People v. Overstreet* (1986) 42 Cal.3d 891, 895.) We turn first to the language of the statute because the words the Legislature chose are the best indicators of its intent. (*Jones, supra,* 5 Cal.4th at p. 1146; *Overstreet, supra,* 42 Cal.3d at p. 895.) We give the words of the statute their ordinary meaning and construe them in context, harmonizing the various parts of the statute. (*People v. Lawrence* (2000) 24 Cal.4th 219, 230; *People v. Hernandez* (2009) 180 Cal.App.4th 337, 348.) If the language of the statute is clear, we presume the Legislature meant what it said and apply the statute according to its terms without further judicial construction. (*Lawrence, supra,* 24 Cal.4th at pp. 230-231; *People v. Alvarado* (2001) 87 Cal.App.4th 178, 185-186.) Although the defendant is entitled to the benefit of every reasonable doubt as to the interpretation of words or the construction of language used in a statute, we must avoid interpretations that would frustrate the purpose of the statute, render it nugatory, and lead to absurd results. (*People v. Alvarado*, *supra,* 87 Cal.App.4th at p. 186.)

Section 667.61 is an alternative and harsher sentencing scheme for certain sex crimes, including sexual penetration in concert.[9] (*People v. Mancebo* (2002) 27 Cal.4th

---

[9] At the time of the offenses, section 667.61 provided, in relevant part:

"(a) A person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years . . . .

27

"(b) Except as provided in subdivision (a), a person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 15 years . . . .

"(c) This section shall apply to any of the following offenses:  [¶] . . . [¶]

"(3) A violation of Section 264.1.  [¶] . . . [¶]

"(5) A violation of subdivision (a) of Section 289.  [¶] . . . [¶]

"(d) The following circumstances shall apply to the offenses specified in subdivision (c):  [¶] . . . [¶]

"(4) The defendant committed the present offense during the commission of a burglary, as defined in subdivision (a) of Section 460, with intent to commit an offense specified in subdivision (c).

"(e) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] . . . [¶]

"(2) Except as provided in paragraph (4) of subdivision (d), the defendant committed the present offense during the commission of a burglary, as defined in subdivision (a) of Section 460, or during the commission of a burglary of a building, including any commercial establishment, which was then closed to the public, in violation of Section 459.

"(3) The defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8.

"(4) The defendant personally used a dangerous or deadly weapon or firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53.  [¶] . . . [¶]

"(6) The defendant engaged in the tying or binding of the victim or another person in the commission of the present offense."  (Stats. 1998, ch. 936, § 9, pp. 6874-6876.)

Although section 667.61 has been amended since the time of Speight's offenses (Historical and Statutory Notes, 49 West's Ann. Pen. Code (2013 supp.) foll. § 667.61, p. 62), the amendments do not affect our analysis.

735, 741-742.) It is denominated the one strike law because it imposes life imprisonment as the punishment for certain sexual offenses committed under specified conditions, even if the offender has no prior convictions. (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1274.) Section 667.61 mandates a sentence of 25 years to life in prison when a defendant is convicted of a sexual offense such as sexual penetration in concert and the People have pleaded and proved one of the circumstances listed in section 667.61, subdivision (d) or at least two of the circumstances listed in section 667.61, subdivision (e). (Stats. 1998, ch. 936, § 9, p. 6874; § 667.61, subds. (a) & (c).) Moreover, section 667.61 mandates a sentence of 15 years to life in prison when a defendant is convicted of a sexual offense such as sexual penetration in concert and the People have pleaded and proved only one circumstance under section 667.61, subdivision (e). (Stats. 1998, ch. 936, § 9, p. 6874; § 667.61, subd. (b).) Among the circumstances identified in section 667.61, subdivision (e) is the one described in subdivision (e)(2): "the defendant committed the present offense during the commission of a burglary . . . ."[10] (Stats. 1998, ch. 936, § 9, p. 6875; § 667.61(e)(2).)

Section 667.61(e)(2) does not say that it only applies when a defendant personally commits a sexual offense. (§ 667.61(e)(2).) By comparison, the Legislature used the word "personally" in other subdivisions of section 667.61 to indicate that the defendant must personally engage in the conduct described. Section 667.61, subdivisions (d)(6) and (d)(7), for example, refer to circumstances where the defendant "personally inflicted" injury or harm. In addition, section 667.61, subdivision (e)(3) refers to a circumstance where the defendant "personally used a dangerous or deadly weapon or a firearm." The

---

[10] There was no evidence that Speight committed a burglary with the intent to commit a sexual offense; therefore, the exception to section 667.61(e)(2) does not apply. (*People v. Hernandez, supra*, 180 Cal.App.4th at p. 349 [section 667.61, subdivision (d)(4) requires intent to commit a specified sex offense upon entry into a residence].)

use of the word "personally" in subdivisions (d)(6), (d)(7) and (e)(3) limits the application of these qualifying circumstances to direct perpetrators. The Legislature knew how to articulate a circumstance limited to personal commission of an offense. (*People v. Murphy* (2001) 25 Cal.4th 136, 159 [use of different language suggests a different legislative intent]; *Faulder v. Mendocino County Bd. of Supervisors* (2006) 144 Cal.App.4th 1362, 1372 [" 'When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning' "].) The fact that the Legislature did not use the word "personally" in section 667.61(e)(2) indicates that section 667.61(e)(2) applies to aiders and abettors and direct perpetrators. (*People v. Calhoun* (2007) 40 Cal.4th 398, 402-405 [statute which provides enhanced penalty for those who flee the scene of the crime " 'after committing a violation of' " the underlying crime applies to an aider and abettor because statutory language is not limited to direct perpetrators]; *People v. Farr* (1997) 54 Cal.App.4th 835, 845 (*Farr*).) We decline to read section 667.61(e)(2) as requiring a defendant to personally commit an enumerated sexual offense where the Legislature did not include such a limitation. (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 350 [" ' "[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." ' "].)

The statute is not ambiguous in this regard, but even if it was, legislative intent supports the application of section 667.61(e)(2) to aiders and abettors. Section 667.61, subdivision (e) describes circumstances that increase a victim's vulnerability, such as the use of a deadly weapon and tying or binding. (*People v. Campbell* (2000) 82 Cal.App.4th 71, 77-78 (*Campbell*).) Section 667.61 mandates lengthy prison sentences where the nature or method of the sex offense placed the victim "in a position of elevated vulnerability." (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1296, italics omitted.) Interpreting section 667.61(e)(2) to apply to aiders and abettors furthers the legislative

30

purpose of deterring the commission of serious sexual offenses during residential burglaries by punishing aiders and abettors whose conduct facilitates or encourages such offenses. (*People v. Alvarado, supra*, 87 Cal.App.4th at p. 187 [purpose of section 667.61(e)(2) is to protect people in their homes and deter, by harsher punishment, burglars from sexually preying on the people they encounter after entering residences].) This is especially appropriate where the aider and abettor engaged in tying the victim, thereby substantially increasing the risk of harm to the victim. (*People v. Manners* (1986) 180 Cal.App.3d 826, 833 [culpability of aider and abettor whose conduct compounds harm to victim is as great as that of perpetrator].) Given the Legislature's concern in section 667.61 over circumstances that increase the vulnerability of victims and the words the Legislature chose to use in section 667.61(e)(2), we conclude that section 667.61(e)(2) applies to aiders and abettors.

Speight nonetheless notes that section 667.61(e)(2) applies if "the defendant *committed* the present offense during the commission of a burglary . . . ." (§ 667.61, subd. (e)(2); emphasis added.) Focusing on the word "committed," he says he did not commit sexual penetration in concert because he was not a direct perpetrator of that offense. But courts have interpreted statutes requiring a defendant to "commit" an offense or act to include aiders and abettors. (*People v. Calhoun, supra*, 40 Cal.4th at pp. 402-405; *Farr, supra*, 54 Cal.App.4th at p. 845; *People v. Manners, supra*, 180 Cal.App.3d at p. 833.) And a defendant violates section 264.1 when he commits sexual penetration as an aider and abettor. (§ 264.1, subd. (a); *People v. Lopez, supra*, 116 Cal.App.3d at pp. 884-885.)

Speight argues that even if an aider and abettor can "commit" a sexual offense within the meaning of section 667.61(e)(2), there was insufficient evidence to establish his liability under a direct aiding and abetting theory. But as we have already explained, substantial evidence supports the finding that Speight aided and abetted Myles in the commission of sexual penetration in concert. We need not consider Speight's contention

31

that section 667.61(e)(2) does not apply to an aider and abettor convicted under a natural and probable consequences doctrine because Speight was not convicted under the natural and probable consequences doctrine on count five and we will dismiss the conviction on count four.

Speight relies on *People v. Cole* (1982) 31 Cal.3d 568, 570-571 (*Cole*), but that case is distinguishable because section 12022.7, the statute examined in *Cole,* provided an enhanced penalty for "[a]ny person who . . . personally inflicts great bodily injury." Here, the Legislature did not limit the section 667.61(e)(2) circumstance to those who "personally" commit an enumerated sexual offense. (§ 667.61(e)(2).)

Speight also relies on *People v. Walker* (1976) 18 Cal.3d 232 (*Walker*) and *People v. Piper* (1986) 42 Cal.3d 471 (*Piper*). Those cases, like *Cole, supra*, 31 Cal.3d 568, involved firearms-use enhancement statutes. The issue in *Walker* was whether section 12022.5 applied only to a defendant who personally used a firearm in the commission of a charged felony. (*Walker*, *supra*, 18 Cal.3d at pp. 235-236.) Section 12022.5 was a sentence enhancement statute that applied to any person who "uses a firearm" in the commission or attempted commission of specified crimes. (*Walker, supra,* at p. 236, fn. 1.) Citing *People v. Hicks* (1971) 4 Cal.3d 757, 765-766 (*Hicks*), superseded by statute on another point as noted in *People v. Coffman and Marlow, supra*, 34 Cal.4th at page 117, the Supreme Court in *Walker* noted that up to that time, it had construed enhancement statutes for being armed as applying only to persons who were personally armed, and the legislative history of section 12022.5 did not disclose any intent to apply the statute differently. (*Walker, supra,* 18 Cal.3d at p. 241.) *Hicks*, in turn, cited *People v. Perkins* (1951) 37 Cal.2d 62, 63-64 (*Perkins*) which held that section 1203, the statute at issue in *Perkins*, required personal use of a firearm or deadly weapon and noted that the Legislature had amended section 1203 to require personal use in response to judicial decisions applying the statute to aiders and abettors. (*Hicks, supra*, 4 Cal.3d at pp. 765-766.) In that context, the *Walker* court stated: "Generally, if a statute is intended to

32

impose a derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves commit the proscribed act.  Such a direction is found in section 31 which fixes responsibility on an aider and abettor for a crime personally committed by a confederate.  But the statute which defines aiders and abettors as principals in the commission of a criminal offense does not also purport to impose additional derivative punishment grounded on an accomplice's personal conduct, as those statutes which provide for such increased punishment ' "do not define a crime or offense but relate to the penalty to be imposed under certain circumstances." '  [Citations.]  Hence the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime." (*Walker, supra,*  18 Cal.3d at pp. 241-242.)  Following long-established precedent and in the absence of contrary legislative intent, the court in *Walker* held that section 12022.5 did not apply to persons who did not personally use a firearm.  (*Walker, supra,* 18 Cal.3d at p. 242.)

*Piper* also involved the interpretation of a firearm use enhancement statute.  The question in *Piper* was whether defendant's prior conviction for shooting at an occupied vehicle constituted a "serious felony" within the meaning of section 1192.7, thereby qualifying him for an enhanced sentence under section 667.  (*Piper, supra*, 42 Cal.3d at p. 473.)  At that time, section 1192.7, subdivision (c)(8) provided that a "serious felony" included "any felony in which the defendant uses a firearm." (*Piper, supra,* at p. 476, italics omitted.)

The Supreme Court interpreted the phrase "uses a firearm" in section 1192.7, subdivision (c)(8) to mean personally uses a firearm.  (*Piper, supra*, 42 Cal.3d at p. 473.)  This holding was based on the syntax of section 1192.7, subdivision (c)(8) -- i.e., the use of the phrase "in which the defendant uses a firearm" rather than "in which a firearm is used" -- and prior decisions, such as *Walker, supra*, 18 Cal.3d 232 and *Cole, supra*, 31

Cal.3d 568, which interpreted similar firearm use language to require a showing of personal use. (*Piper, supra,* 42 Cal.3d at p. 476.)

Outside the context of the firearm use statutes, however, the court in *Farr, supra,* 54 Cal.App.4th 835, held that a statute providing a separate sentencing scheme applied to aiders and abettors where the statute did not condition its application to those who personally commit the offense. (*Id.* at pp. 843-845.) The defendants in *Farr* were convicted of eight felonies, including multiple sex crimes, committed during a home invasion robbery. (*Id.* at pp. 838, 841-842.) As to the sex offenses, the trial court imposed full term consecutive prison sentences pursuant to section 667.6, subdivision (d) (section 667.6(d)). (*Farr, supra,* 54 Cal.App.4th at pp. 838, fn. 2, 842.) Relying on the language of the statute and *Walker, supra*, 18 Cal.3d 232, the defendants in *Farr* argued that section 667.6(d) did not apply to them because they did not personally commit all the sexual assaults. (*Farr, supra,* 54 Cal.App.4th at pp. 842-843.)

The appellate court rejected the argument. It noted that the language of section 667.6 did not explicitly require the defendant to personally commit an enumerated offense. (*Farr, supra,* 54 Cal.App.4th at p. 845.) Additionally, the court found no evidence that the Legislature intended to require a defendant to personally commit a listed sexual offense in order to be subject to full term consecutive sentencing under section 667.6. (*Farr, supra,* at pp. 845-846.) The court distinguished *Walker* because, among other things, section 667.6(d) and other sentencing schemes have not been construed to require an accused to personally commit the offense. (*Farr, supra,* at pp. 843-845.)

After *Farr, supra,* 54 Cal.App.4th 835 was decided in 1997, the Legislature amended section 667.6(d), but did not limit the application of the statute to direct perpetrators. (Historical and Statutory Notes, 49 West's Ann. Pen. Code (2010 ed.) foll. § 667.6, pp. 378–380.)

We likewise conclude that *Walker, supra*, 18 Cal.3d 232, is distinguishable. *Walker* is supported by the Legislature's rejection of judicial decisions that applied firearm use statutes to aiders and abettors and a long line of cases construing "use" to mean "personal use." (*Walker, supra,* at pp. 241-242; *Perkins, supra*, 37 Cal.2d at pp. 64-65.) But the legislative history and precedential decisions applicable to firearm use statutes are not present with regard to section 667.61(e)(2). As we have stated, unlike the other subdivisions in section 667.61, there is no indication of a legislative intent to limit the application of section 667.61(e)(2) to direct perpetrators. Speight fails to demonstrate a basis for reversing the section 667.61(e)(2) finding.

H

In addition, Speight argues that because he did not commit any sexual offense, the one strike finding that he tied or bound the victim in the commission of a sexual offense is not supported by the evidence.

At the time of defendant's conviction, section 667.61, subdivision (e)(6) (former section 667.61(e)(6)) provided that a defendant qualifies for punishment under the one strike law in the circumstance where "[t]he defendant engaged in the tying or binding of the victim or another person in the commission of the present offense." Speight claims the jury's former section 667.61(e)(6) finding must be reversed because there is no evidence that he tied or bound the victim "in the commission of" a charged sexual offense.[11] For the reasons we have already explained, however, substantial evidence

_____

[11] Tying or binding the victim is done "in the commission of" a sexual offense when tying or binding the victim aids the commission of the sexual offense. In *People v. Masbruch* (1996) 13 Cal.4th 1001, the California Supreme Court held that the defendant in that case utilized a gun " 'at least as an aid in completing an essential element of' the crimes of rape and sodomy" and thus the evidence was sufficient to support a finding under section 12022.3, subdivision (a) that the defendant used a firearm in the commission of the offenses. (*Masbruch, supra,* 13 Cal.4th at pp. 1011-1012.) Later, in *People v. Jones* (2001) 25 Cal.4th 98, the Supreme Court said it is undisputed that the

supports the jury finding that Speight committed the sexual offense as an aider and abettor.

Citing *Campbell, supra*, 82 Cal.App.4th 71, Speight claims his participation in tying or binding the victim was not done "in the commission of" a sexual offense because he did not exploit the victim's vulnerability by digitally penetrating her. But the argument repeats his prior contention regarding section 667.61(e)(2) that the word "commit" means "personally commit." We reject his current argument for the same reasons we rejected his prior argument.

Moreover, *Campbell* involved a defendant who, acting alone, committed a sexual assault. (*Campbell, supra*, 82 Cal.App.4th at p. 74.) *Campbell* did not analyze the application of former section 667.61(e)(6) to an aider and abettor. *People v. Alvarado, supra*, 87 Cal.App.4th 178, which is cited in Speight's reply brief, also involves a defendant who acted alone. Contrary to Speight's claim, neither *Campbell* nor *People v. Alvarado* states or suggests that former section 667.61(e)(6) applies only where the defendant personally exploited the victim's vulnerability by sexually assaulting her after she is tied or bound. As for Speight's claim that his participation in the tying or binding of the victim was not done "in the commission of" a sexual offense because he did not intend the commission of a sexual offense, former section 667.61(e)(6) applies regardless of Speight's intent when he tied or bound the victim. (*Campbell, supra,* 82 Cal.App.4th at p. 78 ["the statute does not refer at all to the attacker's objective in performing prohibited acts, and any such particular intention cannot be controlling"].) We reject Speight's former section 667.61(e)(6) claim.

---

phrase "in the commission of" has the same meaning under both section 667.61, subdivision (e)(4), and section 12022.3, subdivision (a). (*Jones, supra,* 25 Cal.4th at pp. 108, fn. 4, 109-110.)

I

Speight says the trial court erroneously believed consecutive sentences were mandatory under section 667.6, subdivision (d) and hence did not exercise informed discretion in sentencing him on count four (sexual penetration). He urges us to remand the matter so the trial court can exercise its discretion.

Because we will dismiss the conviction on count four, we need not address the contention as to that count. But because we will also lift the stay of execution of the sentence on count five (sexual penetration in concert), we will remand the matter to the trial court for resentencing on that count. On remand, the trial court should decide whether consecutive sentencing is mandatory or discretionary under section 667.6 and comply with the strictures in *People v. Belmontes* (1983) 34 Cal.3d 335.

J

Speight asserts that the sentence of 25 years to life in prison constitutes cruel and/or unusual punishment in this context. He challenges the sentence he received on count four under the California and federal Constitutions. Although we will dismiss the conviction on count four, we address this claim because it applies to the 25-year-to-life sentence imposed on count five.

" 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citations.]" (*People v. Em* (2009) 171 Cal.App.4th 964, 971.) Speight bears a " 'considerable burden' " in showing that his sentence is unconstitutional. (*Id.* at p. 972; *Rummel v. Estelle* (1980) 445 U.S. 263, 272 [63 L.Ed.2d 382, 390].)

1

The Attorney General states that Speight forfeited his claim of cruel and/or unusual punishment by failing to raise it below. We agree that Speight's failure to raise his cruel and/or unusual punishment claim in the trial court forfeited any right to appellate review of the claim. "Cruel and[/or] unusual punishment arguments, under the

37

federal or California tests, require examination of the offense and the offender." (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27 [challenge based on *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*)[12] is fact-specific].)  This fact-based inquiry must be raised in the trial court.  (*People v. DeJesus, supra,* 38 Cal.App.4th at p. 27.)  If it is not, it is forfeited.  (*Ibid.; People v. Kelley* (1997) 52 Cal.App.4th 568, 583.)  However, because Speight also raises an ineffective assistance of counsel claim, we discuss the merits of his constitutional claims.

2

We turn first to Speight's state constitutional claim.  Article I, section 17 of the California Constitution prohibits the infliction of cruel or unusual punishment.  A sentence may violate this prohibition " 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'  [Citation.]" (*People v. Uecker* (2009) 172 Cal.App.4th 583, 600.)

"Our Supreme Court has emphasized 'the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual.  The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature.  Perhaps foremost among these are the definition of crime and the determination of punishment.  While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned "unless their unconstitutionality clearly, positively, and unmistakably appears." '  [Citation.]"  (*People v. Kinsey* (1995) 40 Cal.App.4th 1621,

---

[12]  *Dillon* was disapproved on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186.

38

1630.)  " '[F]indings of disproportionality have occurred with exquisite rarity in the case law.' [Citation.]" (*People v. Em, supra*, 171 Cal.App.4th at p. 972.)

Speight's 25-year-to-life sentence was imposed under section 667.61.  That statute reflects a legislative determination that certain sex crimes carried out under particular circumstances warrant harsher punishment.  (*Campbell, supra*, 82 Cal.App.4th at pp. 77-79.)  "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment."  (*In re Lynch* (1972) 8 Cal.3d 410, 423–424 (*Lynch*).)

We consider three areas of focus in assessing a penalty for disproportionality under the California Constitution:  (1) an examination of the nature of the offense and the offender, with particular regard to the degree of danger both present to society; (2) a comparison of the sentence with punishments for different offenses in the same jurisdiction; and (3) a comparison of the sentence with punishments for the same offense in other jurisdictions.  (*People v. Uecker, supra,* 172 Cal.App.4th at p. 600 [*Lynch, supra,* 8 Cal.3d 410].)

In examining the first area of focus -- the nature of the offense and the offender -- " 'we must consider not only the offense as defined by the Legislature but also "the facts of the crime in question" (including its motive, its manner of commission, the extent of the defendant's involvement, and the consequences of his acts); we must also consider the defendant's individual culpability in light of his age, prior criminality, personal characteristics, and state of mind.' [Citation.]" (*People v. Uecker, supra,* 172 Cal.App.4th at p. 600.)

The California Supreme Court in *Dillon, supra,* 34 Cal.3d 441, after applying the first area of focus, held that under the circumstances of that case, the life sentence the defendant received for first degree murder under the felony-murder rule violated California's prohibition against cruel or unusual punishment. (*Dillon, supra*, 34 Cal.3d at pp. 479-489.) The defendant was a 17-year-old high school student with no prior criminal record at the time of the offenses. (*Id.* at pp. 451, 486, fn. 35.) He lived not far from a secluded farm on which the victim and his brother illegally grew marijuana. The defendant knew the victim and his brother guarded their property and carried firearms in this endeavor. The defendant and a friend recruited six other classmates to steal marijuana from the victim's property. Some of the boys armed themselves with shotguns, a baseball bat, and a knife. The defendant carried a .22 caliber semi-automatic rifle. The boys split up into four pairs. (*Id.* at p. 451.) One of the boys accidentally discharged his shotgun twice. (*Id.* at pp. 452, 482.) Believing that his friends had been fired upon, hearing the victim approach his location where retreat and hiding were not possible, and believing the victim was about to shoot him, the defendant fired his rifle at the victim nine times, killing him. (*Id.* at pp. 482-483.) The jury and trial judge credited the defendant's testimony that he shot the victim out of fear for his life and panic. (*Id.* at p. 482.) A psychologist testified at trial that the defendant was unusually immature for his age. (*Id.* at p. 483.)

The jury in *Dillon* was reluctant to convict the defendant of first degree murder but was instructed that a verdict of first degree murder was required if the jury found that the killing occurred during an attempted robbery. (*Dillon, supra*, 34 Cal.3d at p. 484.) The trial judge sympathized with the jury's reluctance to apply the felony-murder rule under the facts of that case and commented that the evidence did not support a first degree murder conviction under any theory other than the felony-murder rule, but " 'the law is the law.' " (*Ibid.*) After it was determined that the defendant was ineligible for

40

commitment to the California Youth Authority, the trial court was compelled to sentence him to life in prison.  (*Id.* at pp. 486-487.)

Finding the defendant's life sentence grossly disproportionate to the offense as committed and to the defendant's individual culpability, the California Supreme Court modified the judgment to reduce the defendant's conviction to second degree murder. (*Dillon, supra*, 34 Cal.3d at p. 450, 488-489.)  In so holding, the Court considered the defendant's lack of criminal record, unusual immaturity and resultant inability to appreciate the risk he created or to extricate himself from the situation without panicking, and the fact that his cohorts, who were aiders and abettors to the killing, were not convicted of homicide or sentenced to state prison.  (*Id.* at pp. 488-489.)

Speight compares himself and the facts in this case to the defendant and the facts in *Dillon, supra,* 34 Cal.3d 441, and argues the first area of focus weighs in his favor.  He points to his youth at the time of the offense and lack of a prior criminal record.  He also asserts that weapons were not involved in the charged offenses and he did not personally commit sexual penetration but instead tried to stop Myles from committing the assault. Speight says he is not the sort of perpetrator that the one strike law was intended to target because he is not a "serious and dangerous sex offender."

It is true that Speight had no criminal record, but the seriousness of the offenses he committed outweighs his lack of prior criminal history.  (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 17; *People v. Alvarado, supra,* 87 Cal.App.4th at pp. 199-201 [mandatory one strike term of 15 years to life for defendant who was 18 years old at time of offense and had no criminal record was not cruel or unusual].)  And although Speight was only 17 years old at the time of the offenses, he was older than Myles and there is no evidence that Speight was unusually immature for his age.  Speight was not a mere passive observer in the events leading to the commission of sexual penetration.  Speight identified the victim's house to Myles as a house "to hit for PSP's."  He led Myles to the victim's house.  He agreed to "hit" the victim's house with Myles even though he did not

41

know Myles well and did not trust him. Speight took steps to determine that the 14-year-old victim was at home alone and proceeded with the burglary after Myles expressed the intent to "rush" into the house and grab the victim. Soon after gaining entry into the victim's house, Speight grabbed the victim's arm and, according to the victim, placed his arm around her neck, putting her in a headlock. Speight then saw Myles hit the victim hard enough to cause the victim to come out of Speight's arms, yet Speight thought he would simply "go along with it and just get it done." Speight said nothing, walked away from the victim, and proceeded to search the house for things to take. According to the victim, Speight threatened to hurt her sister if the victim did not cooperate. Speight saw Myles assaulting the victim and heard Myles say he planned to rape the victim, but Speight left the victim alone with Myles in the hallway. The victim testified that Speight did nothing to stop Myles from harming her. Speight knew Myles intended to rape the victim but nonetheless helped Myles restrain the victim, and either bound the victim himself or helped Myles bind her. Although Speight told Myles to leave the victim alone, that occurred after defendants bound the victim and after Myles digitally penetrated her.

Speight was an active participant in the planned burglary and his conduct facilitated the commission of sexual penetration by Myles. (*People v. Em, supra,* 171 Cal.App.4th at pp. 966-967, 975-976 [two consecutive 25-year-to-life terms imposed on defendant who was only 15 years old at time of offense was not cruel and/or unusual where defendant actively participated in a robbery by gang members and one of the participants shot and killed the victim]; *People v. Gonzales*, *supra*, 87 Cal.App.4th at pp. 5-6, 16-19 [sentence of total of 50 years to life for first degree murder wherein a principal personally used a firearm in the commission of the offense imposed against 16-year-old defendants convicted as aider and abettors was not cruel or unusual where the shooter openly carried a gun as defendants, who were gang members, advanced upon the victims after a perceived act of disrespect]; *People v. Ortiz* (1997) 57 Cal.App.4th 480,

42

486-487 [sentence of 26 years to life for 14-year-old defendant who participated in an armed robbery and was convicted of first degree murder as an aider and abettor was not cruel or unusual].) We do not agree with Speight's assessment that his only offense was burglary or robbery. The jury convicted Speight of "serious" and "violent" felonies under the three strikes law and Speight was statutorily ineligible for probation. (§§ 667.5, subd. (c), 667.61, subd. (h), 1170.12, 1192.7, subd. (c), 1203.065, subd. (a).) Unlike in *Dillon,* there is no evidence of reluctance by the trial judge to impose a 25-year-to-life sentence on count five, and there is no evidence of a disparity in sentencing between defendants.

In addition, the inherent danger of home invasion robberies and the harm caused to victims cannot be overlooked. (*People v. Alvarado, supra*, 87 Cal.App.4th at p. 200 [the double trauma of having one's home invaded and then being sexually violated is substantial]; *People v. Estrada, supra,* 57 Cal.App.4th at p. 1281; *People v. Nguyen, supra,* 21 Cal.App.4th at pp. 532-533.) During the incident, the victim was placed in a headlock, groped, threatened, punched, bound and sexually assaulted. Defendants left the victim naked from the waist down next to her two-year-old sister, with the victim's hands tied behind her back and her face bloody and battered.

As for the second area of focus -- a comparison of the sentence with punishments for different offenses in the same jurisdiction -- Speight points out that his aggregate sentence of 28 years to life exceeds the penalty for first degree murder, which is 25 years to life. But the punishment for first degree murder may be greater than 25 years to life because a person convicted of first degree murder may be subject to the death penalty or life in prison without the possibility of parole. (§ 190, subd. (a).) Speight is eligible for parole. In addition, Speight's argument does not take into account the legislative purpose of providing harsher punishment for serious sexual offenses committed under aggravated circumstances that increase the victim's vulnerability. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 808.) Speight's one strike sentence was based on his commission of

43

multiple serious or violent offenses:  first degree burglary and sexual penetration in concert while binding the victim.  (*People v. Estrada, supra*, 57 Cal.App.4th at p. 1282 [the penalty for a single offense cannot properly be compared to the one strike penalty for committing multiple offenses]; *People v. Crooks, supra*, 55 Cal.App.4th at p. 807 [same].)  Punishing these crimes with a 25-year-to-life sentence is not shocking or outrageous.  (*People v. Alvarado, supra*, 87 Cal.App.4th at p. 200; *People v. Estrada, supra*, 57 Cal.App.4th at pp. 1280-1282.)

Turning to the third area of focus -- a comparison of the sentence with punishments for the same offense in other jurisdictions -- Speight does not make a showing that the section 667.61 penalty he received is out of line with punishments prescribed for the same offense in other states having identical or similar constitutional provisions.  (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282-283; *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1159 [appellate contentions must be supported by analysis].)  But even if California has taken a more aggressive approach than other states in setting punishment under the one strike law, that fact alone would not necessarily render Speight's sentence unconstitutional.  (*People v. Uecker, supra,* 172 Cal.App.4th at p. 601; *People v. Alvarado, supra*, 87 Cal.App.4th at pp. 200-201; accord, *Rummel v. Estelle, supra,* 445 U.S. at pp. 281-282 [63 L.Ed.2d at pp. 395-396] [even if a state's statute is the most stringent in the nation, that severity does not render a defendant's sentence grossly disproportionate to his offenses].)

Speight fails to show that, applying the three areas of focus to the circumstances of this case, his sentence was so disproportionate that it shocks the conscience and offends notions of human dignity.

3

Speight also contends the sentence he received violates the Eighth Amendment to the United States Constitution.  He claims, based on the same factors supporting his state constitutional claim, that his "sentence should be declared cruel and unusual punishment

44

as applied to him."  For the reasons we have explained, Speight's cruel and unusual punishment claim under the federal Constitution fails.

The Eighth Amendment, which forbids cruel and unusual punishments, contains a proportionality principle that applies to noncapital sentences.  (*Graham v. Florida* (2010) __ U.S. __ [176 L.Ed.2d 825, 835-836] (*Graham*); *Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 117] (lead opn. of O'Connor, J.); cf. *id.* at pp. 32-33 [155 L.Ed.2d at p. 125] (dis. opn. of Stevens, J.) & *id.* at p. 35-36 [155 L.Ed.2d at p. 127] (dis. opn. of Breyer, J.).)  But the Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836, 869] (conc. opn. of Kennedy, J.).)  Strict proportionality between the crime and the sentence is not required.  (*Ibid.*)  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  (*Rummel v. Estelle, supra,* 445 U.S. at p. 272 [63 L.Ed.2d at 390].)

Proportionality analysis considers the gravity of the current offense compared with the harshness of the penalty, in light of the state interests behind the sentencing statute. (*Ewing v. California, supra,* 538 U.S. at pp. 28-30 [155 L.Ed.2d at pp. 122-123] (lead opn. of O'Connor, J.).)  Based on our examination of the entire record, we conclude the one strike sentence imposed in this case is not grossly disproportionate to the offenses committed.  The conduct leading to the current offenses was not passive, harmless, or a mere technical violation of the law.  (Cf. *Solem v. Helm* (1983) 463 U.S. 277, 296 [77 L.Ed.2d 637, 653]; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1077.)

Speight says that given his youth and immaturity, the penological goals set forth in *Graham, supra*, ___ U.S. ___ [176 L.Ed.2d 825] militate against imposition of a life sentence with a minimum term.  But *Graham* is not on point.  The Supreme Court held in Graham that it is unconstitutional to impose a sentence of life in prison without the possibility of parole against a juvenile for a nonhomicide offense.  (*Graham, supra,* ___

45

U.S. ___, ___, ___ [176 L.Ed.2d at pp. 832, 845, 850].)  Here, however, Speight is eligible for parole.

K

Speight contends his trial counsel provided ineffective assistance.  He claims his counsel failed to object to the erroneous instructions concerning "in concert," corroboration of his testimony, and the lesser included offenses on count four.  He also claims his counsel failed to seek relief from cruel and/or unusual punishment.

To establish a claim of ineffective assistance of counsel, the defendant must prove that (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to the defendant.  (*People v. Maury, supra,* 30 Cal.4th at p. 389; *Strickland v. Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693].)  We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. at p. 697 [80 L.Ed.2d at p. 699]; *In re Cox* (2003) 30 Cal.4th 974, 1019-1020.)  We review trial counsel's performance with deferential scrutiny, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and recognizing the many choices that attorneys make in handling cases and the danger of second-guessing an attorney's decisions.  (*People v. Maury, supra,* 30 Cal.4th at p. 389; *Strickland v. Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694].)

Regarding the meaning of the words "in concert," we have concluded that the trial court properly instructed the jury.  And we have determined that the 25-year-to-life sentence is not unconstitutionally cruel and/or unusual.  Because there was no error in connection with those matters, there was no meritorious basis for Speight's trial counsel to object.  Speight cannot establish that his trial counsel was deficient on those issues.

46

(*People v. Weaver* (2001) 26 Cal.4th 876, 931 [counsel is not ineffective for failing to make a meritless objection or motion]; *People v. Memro* (1995) 11 Cal.4th 786, 834, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2; *People v. Maury, supra,* 30 Cal.4th at p. 389 [defendant must establish deficiency in counsel's performance].)

We need not address Speight's contention pertaining to the lesser included offenses on count four because we will dismiss that conviction.

Speight's remaining ineffective assistance claim -- that his trial counsel failed to object to the erroneous instruction regarding corroboration of his testimony -- fails because he has not demonstrated prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218; *Strickland v. Washington*, *supra*, 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698.) "[P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury, supra,* 30 Cal.4th at p. 389.) Defendant must show a reasonable probability of a more favorable result. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 217-218; *Strickland v. Washington*, *supra*, 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].) It is not enough for defendant to show that errors had some conceivable effect on the outcome of the case. (*People v. Ledesma, supra,* 43 Cal.3d at p. 217.)

As we have explained in this opinion, the record establishes beyond a reasonable doubt that any error in instructing the jury pursuant to CALCRIM No. 301 did not contribute to the verdict on count five. Speight cannot show prejudice resulted from his trial counsel's alleged deficiency.

L

Speight claims the abstract of judgment must be corrected to reflect that he was convicted on count five of sexual penetration in concert, not rape in concert. The Attorney General agrees, and so do we.

The abstract of judgment incorrectly indicates that Speight was convicted on count five of rape in concert. We will direct the trial court to prepare a corrected abstract of judgment.

DISPOSITION

The judgment against Myles is affirmed. The trial court is directed to correct the abstract of judgment to indicate that Myles was convicted on count five of sexual penetration in concert, not rape in concert. The trial court shall forward a certified copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

In Speight's case, the conviction for sexual penetration (count four) is dismissed, and the stay of execution of sentence on the conviction for sexual penetration in concert (count five) is lifted. The matter is remanded to the trial court with directions to resentence Speight on count five in accordance with *People v. Belmontes, supra,* 34 Cal.3d 335. In all other respects the judgment is affirmed. The trial court is further directed to amend the abstract of judgment to reflect dismissal of the conviction on count four and the new sentence on count five, and to correct the abstract of judgment to indicate that Speight was convicted on count five of sexual penetration in concert, not rape in concert. The trial court shall forward a certified copy of the amended and

48

corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

                                                              _____MAURO_____, J.

We concur:

_____ROBIE_____, Acting P. J.

_____HOCH_____, J.